STATE OF NORTH CAROLINA v. MARIO LYNN PHILLIPS

No. 48A08

(Filed 16 June 2011)

## 1. Constitutional Law— right to counsel—no request by defendant—counsel available

Defendant's state and federal constitutional rights to counsel were not violated where investigators continued to question him after an attorney arrived at the sheriff's office and requested to see defendant, but defendant never stated that he wanted the questioning to stop or that he wanted to speak with an attorney. Indigent Defense Services rules authorizing provisional counsel to seek access to a potential capital defendant do not require law enforcement to provide that access when the suspect validly waives his or her *Miranda* rights.

## 2. Confessions and Incriminating Statements— voluntariness—findings—impairing substances

The trial court did not err by denying defendant's motion to suppress an inculpatory statement where defendant alleged that the court's findings as to the impairing substances he had consumed were not sufficient. Findings as to the precise amount and type of any impairing substances consumed by defendant or the time of their consumption were unnecessary for determining whether defendant's statement was given voluntarily.

## 3. Constitutional Law— effective assistance of counsel—failure to withdraw and testify

Defendant was not denied effective assistance of counsel in a first-degree murder prosecution by his counsel's failure to withdraw and testify about a statement by the sheriff to defense counsel that defendant was stoned. Defense counsel was in the best position to determine whether a conflict existed. Applying *Strickland v. Washington*, 466 U.S. 668, there was no reasonable possibility that the outcome of a pretrial suppression hearing, the guilt phase, or the sentencing phase would have been different but for counsel's decision.

## 4. Constitutional Law— due process—testimony conflicting with prior notes

There was no error in a first-degree murder prosecution where defendant contended that the prosecution knowingly

elicited or failed to correct false testimony where a witness's testimony conflicted with notes taken by prior prosecutors and an investigator. The record did not establish whether the witness's direct testimony was inaccurate, whether her pretrial interview statements were inaccurate, whether the notes of those interviews were inaccurate, or whether the witness's recollection changed. Moreover, there was no indication in the record that the State knew the testimony was false, and any inconsistency was addressed on cross-examination.

**5. Evidence— detectives' statements—defendant's mental state when arrested**

There was no plain error where the trial court failed to instruct *ex mero motu* that statements by detectives about defendant's physical and mental state when arrested could be considered for the truth of the matter asserted. The detectives' impressions of defendant when he was taken into custody were not especially probative of defendant's mental state at the time the crimes were committed and were not relevant to whether the State had met its burden of proof in establishing aggravating circumstances.

**6. Constitutional Law— effective assistance of counsel—failure to object—no prejudice**

Defendant did not establish the necessary prejudice for an ineffective assistance of counsel claim arising from the failure to object to certain statements by detectives.

**7. Constitutional Law— effective assistance of counsel—failure to argue—position contrary to law**

A first-degree murder defendant was not denied effective assistance of counsel where his trial counsel did not argue that out-of-court statements that were inconsistent with the witnesses' trial testimony were admissible as substantive evidence. To do so, defendant's counsel would have had to take a position contrary to the existing law of North Carolina.

**8. Evidence— testimony—personal knowledge**

There was no plain error in a first-degree murder prosecution in the admission of certain testimony by a victim where the statements of the witness were helpful to an understanding of her testimony and were rationally based on her perceptions at the scene.

**9. Kidnapping— first-degree—lack of parental consent—evidence sufficient**

The trial court did not err by denying defendant's motion to dismiss first-degree kidnapping charges on grounds that the State failed to present either direct or circumstantial evidence of lack of parental consent. Viewing the evidence in the light most favorable to the State, it was reasonable for the jury to find that the witness's parents did not consent to her being taken by defendant.

**10. Criminal Law— prosecutor's argument—defense concession of guilt**

The trial court did not err in the guilt-innocence phase of a first-degree murder prosecution by failing to intervene *ex mero motu* in a prosecutor's argument that allegedly mischaracterized defense counsel's statement in *voir dire* conceding guilt of second-degree murder. Although the prosecutor's comment, taken in isolation, could be understood to mean that defense counsel conceded guilt entirely, the brief misstatement did not rise to the level of gross impropriety in light of all of the arguments of the parties and the court's instructions.

**11. Criminal Law— prosecutor's closing arguments—diminished capacity**

The trial court did not err by not intervening *ex mero motu* in the prosecutor's argument on diminished capacity in a first-degree murder prosecution where the prosecutor merely pointed out that another witness was available, and the jury would not have interpreted another reference as setting out elements of the defense.

**12. Criminal Law— prosecutor's argument—impeachment of expert witness**

The trial court was not required to intervene *ex mero motu* in the prosecutor's closing argument of the prosecutor in a first-degree murder prosecution when the prosecutor referred to the "convenience" of the testimony of defendant's expert witness on diminished capacity. The prosecutor sought to impeach the expert opinion by pointing out that the doctor's opinion covered only the relatively short span that defendant was committing criminal acts.

**13. Criminal Law— prosecutor's argument—diminished capacity defense—inconsistent conduct**

The trial court did not err by not intervening in the guilt-innocence phase of a first-degree murder prosecution where the prosecutor argued against diminished capacity by pointing out that defendant had not made efforts to assist the victims or express remorse. The prosecutor was pointing out aspects of defendant's conduct that she contended were inconsistent with diminished capacity.

**14. Criminal Law— prosecutor's argument—diminished capacity—reasonable inferences**

The prosecutor did not make grossly improper comments on defendant's diminished capacity defense during her closing argument in a first-degree murder prosecution where the comments argued reasonable inferences from defendant's actions.

**15. Sentencing— capital—prosecutor's argument—role of mercy**

The trial court did not err by not intervening *ex mero motu* in a capital sentencing proceeding when the prosecutor discussed the role of mercy in the sentencing. The prosecutor asked the jury not to impose a sentence based on emotions divorced from the facts of the case and did not foreclose considerations of mercy or sympathy.

**16. Criminal Law— prosecutor's argument—not grossly improper**

Certain portions of the State's closing argument were not grossly improper and the failure to object to those arguments was not ineffective assistance of counsel. Contentions about closing arguments not raised at trial are reviewed for gross impropriety rather than plain error, and there was no ineffective assistance of counsel because there was no reasonable probability that the outcome of the trial would have been different had defense counsel objected to the arguments.

**17. Sentencing— capital—mitigating circumstances—no significant history of prior criminal activity**

In a capital sentencing proceeding, there was evidence to support the mitigating circumstance of no significant history of criminal activity, N.C.G.S. § 15A-2000(f)(1), and counsel did not provide ineffective assistance of counsel by moving that it be submitted.

**STATE v. PHILLIPS**

[365 N.C. 103 (2011)]

**18. Sentencing— capital—mitigating circumstances—relatively minor participant**

While the trial court erred in a capital sentencing proceeding by submitting the mitigating circumstance that defendant was a relatively minor participant in the murder, the outcome would not have been different if the court had withheld the instruction.

**19. Sentencing— capital—death sentence—proportionate**

A sentence of death was not disproportionate where defendant personally committed three murders and participated in a fourth, killings that involved the close-range shooting of young, unarmed victims who had done defendant no wrong. One victim was killed in his own home, and the murders were part of a course of conduct.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing a sentence of death entered by Judge James M. Webb on 17 October 2007 in Superior Court, Moore County, upon jury verdicts finding defendant guilty of four counts of first-degree murder. On 30 April 2009, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 15 February 2010.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Special Deputy Attorney General, and Charles E. Reece, Assistant Attorney General, for the State.*

*Staples S. Hughes, Appellate Defender, by Barbara S. Blackman and Anne M. Gomez, Assistant Appellate Defenders, for defendant-appellant.*

EDMUNDS, Justice.

In the early morning hours of 19 December 2003, Fayetteville police notified defendant that his brother had been shot. Defendant, who had been drinking heavily in addition to using marijuana and Ecstasy the night before, apparently assumed his brother was dead and continued to consume alcohol and drugs after hearing the news. Later that morning, defendant, his girlfriend Renee McLaughlin (McLaughlin), and his friend Sean Ray (Ray) drove to Moore County to tell defendant's mother about the shooting. Afterwards, they visited Daryl Hobson (Hobson) at the Carolina Lakes Trailer Park in Carthage to buy more marijuana. Hobson had none for sale but

accompanied them to the nearby mobile home belonging to Eddie Ryals (Ryals), who he understood had drugs. There they met twenty-one-year-old Ryals, his fifteen-year-old girlfriend Amanda Cooke (Cooke),[1] eighteen-year-old Carl Justice (Justice), and nineteen-year-old Joseph Harden (Harden).

Cooke testified that after thirty to thirty-five minutes of conversation, Ryals stood up to use the bathroom, turning his back to defendant for the first time. Defendant pulled a pistol from his trousers, asked where Ryals's money and drugs were, then opened fire, shooting Ryals once in the chest and once in the abdomen. He also shot Justice once in the chest. When Ryals fell, defendant kicked him, then grabbed Ryals's shotgun from the corner of the room and beat him in the face with it, demanding money and drugs. Cooke's trial testimony described a chaotic scene, and Ryals's autopsy revealed that he was also stabbed in the neck during the melee. Ryals repeatedly said he had nothing and they could take what they wanted. He also asked them not to hurt Cooke.

Defendant turned to approach Harden, who was sitting in a chair across the room, and shot him in the chest. At some point, Harden also suffered a nonfatal stab wound to the chest. Defendant reloaded his revolver, inserting individual shells into the cylinder without apparent difficulty.

Defendant, McLaughlin, and Ray instructed Cooke and Hobson to move to the kitchen, where the doors to the outside were less accessible. Defendant and Ray dragged Ryals to the kitchen, and Ray told Cooke and Hobson to lie down on the floor. After instructing Ray and McLaughlin to make sure Cooke and Hobson did not move, defendant went through Ryals's residence searching for drugs and money.

Cooke pleaded to be released, claiming she had a baby, but defendant told her to shut up and that they could not leave any witnesses. Cooke asked McLaughlin if she could go to the bathroom, but defendant told McLaughlin to refuse the request, adding that Cooke should urinate on herself. Someone knocked on the door of Ryals's trailer, and Ray put his hand over Cooke's mouth and told her not to say a word. After the knocking stopped, defendant handed Ray a kitchen knife and told him to deal with Cooke and Hobson so that defendant would not be the only person in trouble. Defendant shot Hobson in the neck at point-blank range and Ray stabbed Hobson in

---

1. This witness's name at the time of trial was Amanda Cooke Varner.

the chest, inflicting a fatal wound.[2] Ray then tried to slip his hand down inside Cooke's shirt. When she threw him off and rose to her feet, defendant saw them struggling and, from a distance of approximately five feet, shot Cooke twice, once in the chest and once in the side, causing her to fall. Defendant gave Ray another knife and ordered him to "finish [Cooke] off." Ray stabbed Cooke once and began to get up from the floor, but when defendant expressed scorn, Ray stabbed her more than twenty times.

Cooke wavered in and out of consciousness but observed defendant and the others pouring gasoline in Ryals's residence and setting it afire. Defendant, McLaughlin, and Ray left the residence, although Ray paused long enough to grab Cooke by the hair and slash her throat. Once they were gone, Cooke crawled out the back door and around to the front yard. She saw an open-bed pickup truck approaching and, briefly believing help was at hand, closed her eyes. Instead, she heard defendant and Ray say they were going to kill her and, looking up, saw that defendant, Ray, and McLaughlin had emerged from the truck.

Defendant and Ray placed Cooke in the back of the truck amid several bags of garbage, and defendant then drove the truck around a corner and backed up to a trash pile. When the truck bogged down in sand and the sirens of approaching fire trucks could be heard, defendant, Ray, and McLaughlin fled, abandoning Cooke in the truck.

Cooke survived her ordeal, though she was hospitalized for thirteen days and endured numerous surgeries. Ryals, Hobson, Justice, and Harden died. Their bodies were recovered from Ryals's residence after Cameron Fire Department firefighters extinguished the blaze. Autopsies revealed that Harden died as a result of a gunshot wound to the heart, Hobson died from stab wounds to his chest, Ryals died as a result of being both shot in and stabbed in the heart, and Justice died from of a gunshot wound to the heart. Defendant was apprehended a few hours later in his mother's mobile home, across the street from Ryals's residence.

Later that day, defendant gave a detailed confession to Detective Sergeant Timothy Davis of the Moore County Sheriff's Department. In his statement, defendant said that he shot Ryals and another male with a shotgun and Hobson and another male with a pistol. He further stated that Ray stabbed the victims after defendant shot them "to

---

2. The evidence in the record is conflicting as to the order in which these wounds were inflicted on Hobson.

make sure that they were dead." At trial, defendant's former cellmate Frederick Brown testified that defendant told him he was incarcerated "for murder" that occurred during "an attempted robbery." According to Brown, defendant told him that he shot "Eddie" (Ryals) twice with a revolver and then shot everyone else in the residence after they lay on the floor. Defendant added that he told "Sean" (Ray) to stab everyone to make sure they were dead. Brown also testified that defendant said to him, "Brown, these crackers think that I'm crazy, so I'm just playing it off to get life and not death." Additional facts will be set out as necessary for discussion and analysis of the issues.

Defendant was indicted for four counts of first-degree murder. In addition, he was indicted for robbery of Ryals with a dangerous weapon, attempted murder of Cooke, aggravated first-degree kidnapping of Cooke (presented in two indictments), assault on Cooke with a deadly weapon with intent to kill inflicting serious injury, and first-degree arson. After the close of evidence during the guilt-innocence portion of the trial, the court dismissed one indictment for first-degree kidnapping. On 10 October 2007, the jury found defendant guilty of all four counts of first-degree murder. Each of the murder verdicts was based on malice, premeditation, and deliberation. In addition, each murder conviction was based on felony murder with the underlying felonies being robbery with a firearm and arson. The jury also found defendant guilty of first-degree kidnapping, attempted first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, robbery with a firearm, and first-degree arson. Following a capital sentencing hearing, the jury recommended a sentence of death for each murder conviction. Defendant appealed his capital convictions to this Court, and we allowed his motion to bypass the Court of Appeals as to his other convictions.

## PRETRIAL MATTERS

Defendant argues that the trial court erred in denying his motion to suppress the statement he made to Detective Davis shortly after he was apprehended. Although the trial court did not resolve this motion until the trial was under way, it was filed prior to trial, so we will consider this matter along with defendant's other pretrial issues. In his motion, defendant argued that he was denied his statutory and constitutional rights to an attorney when appointed provisional counsel, who was attempting to meet with him because he was a person over the age of seventeen charged with murder, was denied access to him

at the time he made the statement. In addition, defendant argued in the motion that he was substantially impaired from drugs and alcohol and unable to understand the consequences of his actions when he waived his *Miranda* rights.

[1] We first consider defendant's contention that he was improperly denied access to counsel. The record indicates that when defendant was arrested, he was taken to the Moore County Sheriff's Office. Upon defendant's arrival, Detective Davis gave him a printed form setting out his *Miranda* rights and read through the form with him. Defendant legibly wrote his full initials, "MLP," next to printed statements on the form informing him of his rights, acknowledging each. Most pertinent to defendant's motion to suppress, he initialed the form to acknowledge his understanding that (1) he had the right to speak to a lawyer for advice before being questioned and to have that lawyer present during questioning, and (2) if he could not afford a lawyer, he could have one appointed for him before any questioning began. After going through the form with Detective Davis and initialing each individual right, defendant signed the portion of the form waiving those rights.

Detective Davis, aided by Moore County Sheriff's Detective Sergeant Robert Langford, then questioned defendant. Although defendant at first denied any knowledge of the incident, approximately thirty minutes into the interview he responded to a question of whether he had murdered four people by saying, "F[——] it. I did it." Detective Davis continued his questioning and, over the next two and a half hours, defendant provided an inculpatory account of the shootings. Defendant dictated the details of the crime while Detective Davis typed them into a statement. At no time did defendant request a lawyer or ask to stop the interrogation.

While defendant was with Detective Davis, attorney Bruce Cunningham (attorney Cunningham) arrived at the sheriff's office and asked to see defendant. North Carolina Capital Defender Robert Hurley had appointed attorney Cunningham to be provisional counsel for Moore County. Hurley testified at the hearing on defendant's motion to suppress that upon learning of an arrest in a potential capital case, one duty of provisional counsel is "to go immediately and try to see the defendant, explain to them their rights, and take any other action that they feel is appropriate." Consistent with these responsibilities, attorney Cunningham had gone promptly to the Moore County's Sheriff's Office. However, because defendant had not asked to speak with an attorney, attorney Cunningham was denied

access to defendant. Only after the interview was completed did investigators inform defendant that attorney Cunningham was at the sheriff's office and had requested to see him.

A criminal defendant facing imprisonment has a Sixth Amendment right to counsel under the United States Constitution. *Argersinger v. Hamlin*, 407 U.S. 25, 37, 32 L. Ed. 2d 530, 538 (1972). This right applies to the states through the Fourteenth Amendment to the United States Constitution. *State v. Morris*, 275 N.C. 50, 59, 165 S.E.2d 245, 251 (1969). In addition, Sections 19 and 23 of Article I of the North Carolina Constitution provide criminal defendants with a right to counsel. *State v. Sneed*, 284 N.C. 606, 611, 201 S.E.2d 867, 870 (1974). However, an attorney may not force himself or herself on a criminal defendant. "[T]he right to counsel belongs to the defendant, and he retains it even after counsel is appointed. . . . If defendant's waiver of his right to counsel is otherwise voluntary, knowing, and intelligent, his lawyer's wishes to the contrary are irrelevant." *State v. Reese*, 319 N.C. 110, 135, 353 S.E.2d 352, 366 (1987) (internal citations omitted), *overruled on other grounds by State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). Both this Court and the Supreme Court of the United States have held that when an attorney is seeking access to a defendant who has waived counsel, investigators are not required to make the defendant aware of the attorney's efforts. *Moran v. Burbine*, 475 U.S. 412, 425-27, 89 L. Ed. 2d 410, 423-25 (1986); *State v. Hyatt*, 355 N.C. 642, 657-58, 566 S.E.2d 61, 71-72 (2002), *cert. denied*, 537 U.S. 1133, 154 L. Ed. 2d 823 (2003). Therefore, "[u]nless the in-custody suspect 'actually requests' an attorney, lawful questioning may continue" after the suspect has waived his or her *Miranda* rights. *Hyatt*, 355 N.C. at 655, 566 S.E.2d at 70 (citation omitted).

The interrogation began before attorney Cunningham arrived at the sheriff's office. Defendant never stated that he wanted the questioning to stop or that he wanted to speak with an attorney. Accordingly, the investigators did not violate defendant's state and federal constitutional rights to counsel by continuing to question him after attorney Cunningham's arrival at the sheriff's office and request to see defendant.

Defendant also cites statutes and rules of the Office of Indigent Defense Services (IDS) to support his claim that his statement was inadmissible. By statute, indigent defendants are entitled to counsel in "[a]ny case in which imprisonment . . . is likely to be adjudged."

N.C.G.S. § 7A-451(a)(1) (2009). This "entitlement to the services of counsel begins as soon as feasible after the indigent is taken into custody or service is made upon him of the charge, petition, notice or other initiating process" and applies to, *inter alia*, "in-custody interrogation." *Id.* § 7A-451(b), (b)(1) (2009). Even so, another statute in this Article also specifically provides that "[a]n indigent person who has been informed of his right to be represented by counsel at any out-of-court proceeding, may, either orally or in writing, waive the right to out-of-court representation by counsel." *Id.* § 7A-457(c) (2009). The Indigent Defense Services Act of 2000, codified in Article 39B of N.C.G.S. Chapter 7A, established IDS in part to facilitate the provision of quality representation to indigent defendants, *id.* § 7A-498.1 (2009). In carrying out its mission, IDS promulgated Rule 2A.2(a), which provides for the appointment of provisional counsel in cases that are potentially capital:

> Upon learning that a defendant has been charged with a capital offense, the IDS Director may immediately appoint a lawyer on a provisional basis to conduct a preliminary investigation to determine whether the defendant is indigent and needs appointed counsel. Provisional counsel shall report the results of his or her investigation to the IDS Director. If the defendant has not had a first appearance in court, the IDS Director may authorize provisional counsel to attend the defendant's first appearance and advise the court whether the case is a capital case as defined by these rules and therefore subject to the appointment procedures in this subpart. Provisional counsel is authorized to take steps to protect the capital defendant's rights pending appointment of trial counsel by the IDS Director.

Indigent Def. Servs. R. 2A.2(a) ("Appointment of Trial Counsel"), 2010 Ann. R. N.C. 927, 938-39.

While this statutory and regulatory framework seeks to provide representation as expeditiously as possible to potential capital defendants who qualify for appointed counsel, it does not alter the procedure this Court previously has approved that permits defendants to waive their constitutional right to counsel. Section 7A-451(b) states only that "entitlement to the services of counsel begins as soon as feasible," while section 7A-457(c) specifically allows this right to be waived. N.C.G.S. §§ 7A-451(b), -457(c). IDS Rule 2A.2(a) states that "[p]rovisional counsel is authorized to take steps to protect the capital defendant's rights pending appointment of trial counsel." Indigent Def. Servs. R. 2A.2(a), 2010 Ann. R. N.C. at 939. While this rule autho-

rizes provisional counsel to seek access to a potential capital defendant, it does not require law enforcement to provide that access when the suspect has validly waived his or her *Miranda* rights. This assignment of error is overruled.

**[2]** The second issue defendant raises with respect to his motion to suppress is that, in denying the motion, the trial court erred by not making sufficient findings of fact to determine whether the statement was involuntary. Specifically, defendant contends that the court made insufficient findings of fact as to whether he had consumed impairing substances before making the statement, and if so, when he consumed these substances and how much of them he consumed.

A defendant's inculpatory statement is admissible when it "was given voluntarily and understandingly." *State v. Schneider*, 306 N.C. 351, 355, 293 S.E.2d 157, 160 (1982) (citation omitted). A confession may be involuntary when "circumstances precluding understanding or the free exercise of will were present." *State v. Allen*, 322 N.C. 176, 186, 367 S.E.2d 626, 631 (1988). "While intoxication is a circumstance critical to the issue of voluntariness, intoxication at the time of a confession does not necessarily render it involuntary. It is simply a factor to be considered in determining voluntariness." *State v. McKoy*, 323 N.C. 1, 22, 372 S.E.2d 12, 23 (1988) (citations omitted), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). "An inculpatory statement is admissible unless the defendant is so intoxicated that he is unconscious of the meaning of his words." *State v. Oxendine*, 303 N.C. 235, 243, 278 S.E.2d 200, 205 (1981) (citations omitted).

At the evidentiary hearing conducted on defendant's motion to suppress, several witnesses testified as to the level of defendant's purported intoxication. The State called Detective Davis, who transported defendant from where he was apprehended to the sheriff's office, interrogated defendant, and took the statement at issue. Detective Davis testified that defendant readily supplied biographical information for the *Miranda* rights waiver form and wrote his initials and signature on it in a clear hand. Detective Davis added that, after being interviewed for approximately two hours, defendant had no difficulty walking with him to his office where Detective Davis typed the details of the crime as defendant described them to him. Defendant then read the typed statement and objected to the sentence, "I decided to shoot everybody else because I knew that they were witnesses." Detective Davis testified that he recalled defendant saying

those words but nevertheless redacted the sentence as requested. Once that sentence was removed, defendant signed the statement.

Detective Langford, who along with Detective Davis transported defendant to the sheriff's office and assisted with the interrogation, provided similar testimony, noting that defendant was "highly excited" when arrested, but calmed down at the sheriff's office and remained composed thereafter. Cameron Police Chief Gary McDonald, who was in brief contact with defendant at his mother's residence immediately before his arrest, testified that defendant was calm at that time and requested a cigarette from him. When asked if he had told defendant's attorney, Mr. Cunningham, that defendant "looked like he was stoned out of his mind," Chief McDonald responded that he did not remember saying it but would not deny saying it.

In addition, the State called Charles Vance, M.D., a forensic psychiatrist, as an expert witness. Dr. Vance had interviewed defendant, reviewed documents, assessed defendant's mental status both at the time of the shootings and when he was interrogated, and prepared a report. He testified that it appeared defendant "was intoxicated at some level, quite probably on a variety of different substances" during the police interviews, but concluded defendant was not so impaired as to make him incompetent to waive his *Miranda* rights.

Although defendant presented a private investigator who testified that Chief McDonald told him that defendant "appeared to be wired up" at the time of his arrest, defendant relied largely on the content of his own statement to the investigators and their testimony to support his claim of intoxication. He also presented the expert testimony of Moira Artigues, M.D., a forensic psychiatrist. She had interviewed defendant and his codefendants, reviewed pertinent documents, interviewed the arresting officers, and assessed defendant's mental status. She agreed with Dr. Vance's opinion that defendant had consumed some impairing substances the day of the offense. Her conclusion was that defendant was not able rationally to choose whether to make a confession and was not able knowingly and intelligently to waive his constitutional rights.

Based on the evidence presented during the hearing on the motion to suppress, the trial court made extensive oral findings of fact in support of its conclusions of law. The trial court found as fact that defendant initially appeared excited and nervous when arrested,

wiped spittle or white foam from his mouth when he arrived at the sheriff's office and the spittle or foam never reappeared, and vomited during his interview with Detective Davis. The trial court also found that defendant had no difficulty providing his name, address, Social Security number, and date of birth; that Detective Davis observed nothing about defendant to suggest he was impaired by alcohol; that Detective Langford did not observe the odor of any impairing substance about defendant; that defendant requested the sentence, "I decided to shoot everybody else because I knew that there were witnesses," be deleted from his statement;[3] and that defendant appeared to be very calm at the beginning of the interview. Further, the trial court found "that the defendant's level of impairment at the time of the execution of the *Miranda* rights waiver form was not sufficient—if any, was not sufficient to negate his capacity to waive his *Miranda* rights."

"When there is a *material* conflict in the evidence on *voir dire*, the judge *must* make findings of fact resolving any such material conflict." *State v. Lang*, 309 N.C. 512, 520, 308 S.E.2d 317, 321 (1983) (citation omitted). "[A] trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (citations and internal quotation marks omitted). The factual findings by the trial court are supported by competent evidence and resolve all material factual conflicts. Findings of fact as to the precise amount and type of any impairing substances consumed by defendant, or the time of their consumption, are unnecessary for determining whether his statement was given voluntarily.

In addition, "[w]hen reviewing a motion to suppress evidence, this Court determines whether the trial court's findings of fact . . . support the conclusions of law." *State v. Wilkerson*, 363 N.C. 382, 433-34, 683 S.E.2d 174, 205 (2009) (citation omitted), *cert. denied*, —— U.S. ——, 176 L. Ed. 2d 734 (2010). The findings of fact here adequately support the trial court's conclusion of law that defendant's statement "was made freely, voluntarily, and understandingly." This assignment of error is overruled.

**[3]** Defendant next contends that he did not receive effective assistance of counsel because lead defense attorney Cunningham failed to withdraw and testify as a witness for defendant, depriving him of

---

3. Although the trial court's recitation of the wording of this redacted sentence differed from Detective Davis's testimony, the discrepancy is immaterial.

conflict-free counsel.[4] Defendant argues that a withdrawal was necessary because attorney Cunningham remembered Chief McDonald making certain statements to Cunningham that Chief McDonald did not himself recall. Their discrepant recollections became apparent during the following portion of attorney Cunningham's direct examination of Chief McDonald at a pretrial hearing on 31 May 2007:

[Attorney Cunningham:] Let's just get to the point and ask you whether or not you admit or deny saying to me on February 5th, 2004 in the lawyers lounge in the Moore County Courthouse that on December 19th, 2003 when you saw [defendant] his eyes were big, he was wired, and he was stoned out of his mind?

. . . .

[Chief McDonald:] I cannot positively say I did say that or I didn't. I don't remember saying that. That was three years ago. I really don't remember.

[Attorney Cunningham:] Do you deny saying that?

[Chief McDonald:] No, I'm not going to deny saying that.

During this hearing, attorney Cunningham raised no objection but instead advised the court that he felt he would need to testify and therefore would have to withdraw as defendant's counsel, pursuant to Rule 3.7 of the North Carolina State Bar's Revised Rules of Professional Conduct. That Rule generally precludes an attorney from being an "advocate at a trial in which the lawyer is likely to be a necessary witness." N.C. St. B. Rev. R. Prof. Conduct 3.7 ("Lawyer as witness"), 2010 Ann. R. N.C. 759, 842. After reflection, however, attorney Cunningham ultimately concluded that, "in light of [Chief] McDonald's testimony at the previous hearing that he didn't deny saying certain things," he would not need to withdraw and on 6 July 2007, advised the court accordingly. Attorney Cunningham thereafter represented defendant as lead counsel.

At defendant's trial, after Chief McDonald testified for the State as a prosecution witness, he was cross-examined by attorney Cunningham and the following pertinent exchange took place:

4. We note that on 23 December 2004, defendant filed with the trial court a letter stating his dissatisfaction with attorney Cunningham and asking for new counsel. The record does not indicate that any action was taken as a result of this filing. The letter describes events that took place long before the circumstances that defendant now claims constitute ineffective assistance of counsel. Accordingly, we do not consider defendant's letter to be germane to our analysis of the issues now before us.

[Attorney Cunningham:] [D]o you recall saying anything to me about on December 19th Mario appeared to be stoned out of his mind?

. . . .

[Chief McDonald:] I don't recall.

[Attorney Cunningham:] Do you deny it?

[Chief McDonald:] No, I don't.

Attorney Cunningham then showed Chief McDonald a handwritten set of notes, apparently taken by attorney Cunningham, and the exchange continued:

[Attorney Cunningham:] Does that refresh your recollection as to the conversation?

[Chief McDonald:] No.

[Attorney Cunningham:] All right. But you don't deny saying that his eyes were wired; he was—wide open; he was wired and stoned out of his mind, do you?

[Chief McDonald:] No. But I don't recall saying it.

[Attorney Cunningham:] All right.

Ordinarily, to prevail on an ineffective assistance of counsel claim, a defendant must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984); *accord State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985). However, the Supreme Court has applied a different test when the claim of ineffective assistance is based upon a conflict of interest arising out of an attorney's multiple representation of more than one defendant or party, either simultaneously or in succession, in the same or related matters. Under such circumstances, questions may arise as to the attorney's loyalty to any individual client. Defendant's argument assumes that the test applicable in the face of such a conflict also applies to the case at bar.

The United States Supreme Court has considered the appropriate response to such claims in a quartet of cases. In *Holloway v. Arkansas*, 435 U.S. 475, 55 L. Ed. 2d 426 (1978), defense counsel in a criminal case twice advised the court prior to trial of a potential conflict arising from his representation of three codefendants at the

same trial. *Id.* at 477-78, 55 L. Ed. 2d at 430. Although counsel advised the court that he could not cross-examine "one or two" of the codefendants if they testified because he had "received confidential information from them," *id.* at 478, 55 L. Ed. 2d at 430, the trial court denied counsel's pretrial motions to appoint separate counsel, *id.* at 477-78, 55 L. Ed. 2d at 430. Later, during trial, defense counsel advised the court that the potential conflict had matured into a genuine conflict because all three defendants had decided to testify. *Id.* at 478, 55 L. Ed. 2d at 431. Nevertheless, the trial court allowed each defendant to testify. *Id.* at 478-81, 55 L. Ed. 2d at 431-32. Observing that defense counsel is in the best position to determine whether a conflict exists, *id.* at 485-86, 55 L. Ed. 2d at 435, the Supreme Court acknowledged the conflict and stated that "[j]oint representation of conflicting interests . . . . effectively seal[s] [counsel's] lips on crucial matters," making it difficult to measure the precise harm to the defendants, *id.* at 489-90, 55 L. Ed. 2d at 438. Accordingly, the Court held that reversal would be automatic when the trial court improperly forced defense counsel to represent codefendants over counsel's objection. *Id.* at 488-91, 55 L. Ed. 2d at 437-38.

In *Cuyler v. Sullivan*, 446 U.S. 335, 64 L. Ed. 2d 333 (1980), the defendant was represented at his murder trial by the same two attorneys who at later trials represented codefendants whose interests arguably were inconsistent with the defendant's. *Id.* at 337-38, 64 L. Ed. 2d at 339-40. Neither Sullivan nor his attorneys objected to the serial representation. *Id.* at 337-38, 64 L. Ed. 2d at 340. The Supreme Court stated that when multiple representation gives rise to a conflict about which an objection has been raised, the trial court must give a defendant the opportunity to show that "potential conflicts impermissibly imperil [the defendant's] right to a fair trial." *Id.* at 348, 64 L. Ed. 2d at 346. However, "[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." *Id.* at 347, 64 L. Ed. 2d at 346. In the absence of an objection, the trial court's failure to inquire into a conflict will not result in a reversal unless the defendant demonstrates that "an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 350, 64 L. Ed. 2d at 346-47, 348.

In *Wood v. Georgia*, 450 U.S. 261, 67 L. Ed. 2d 220 (1981), a procedurally tangled case, the three defendants' single attorney was provided and paid by another client whose interests may have been adverse to those of the defendants. *Id.* at 266-71, 67 L. Ed. 2d at 227-30. The Supreme Court noted that the possible conflict was "suf-

ficiently apparent" at the defendants' probation revocation hearing to trigger inquiry by the trial court, *id.* at 272, 67 L. Ed. 2d at 230-31, and remanded the case for a hearing to determine whether a conflict actually existed, *id.* at 272-74, 67 L. Ed. 2d at 230-31.

Finally, in *Mickens v. Taylor*, 535 U.S. 162, 152 L. Ed. 2d 291 (2002), a murder case, the defendant's lead attorney was representing the victim on apparently unrelated criminal charges at the time the victim was killed. *Id.* at 164-65, 152 L. Ed. 2d at 299-300. When appointed later to represent the defendant, the attorney did not advise the court or anyone else of his prior representation of the victim. *Id.* at 165, 152 L. Ed. 2d at 300. The Supreme Court held that even when a trial court "fails to inquire into a potential conflict of interest about which it knew or reasonably should have known," *id.* at 164, 152 L. Ed. 2d at 299, the defendant still must establish an actual conflict that "adversely affected his counsel's performance," *id.* at 173-74, 152 L. Ed. 2d at 305. The Court added that, under *Sullivan*, no inquiry by the trial court is required if the court is aware of no more than a "vague, unspecified possibility of conflict." *Id.* at 168-69, 152 L. Ed. 2d at 302. Only when a conflict " '*actually affect[s] the adequacy of his representation*,' " will the defendant be allowed relief without having to establish prejudice. *Id.* at 171, 152 L. Ed. 2d at 304 (citation omitted). Because the circuit court had found that the petitioner in *Mickens* did not demonstrate that the conflict adversely affected counsel's performance, *id.* at 165, 152 L. Ed. 2d at 300, the Supreme Court denied habeas relief, *id.* at 173-74, 152 L. Ed. 2d at 305.

We now apply the holdings of these cases to the case at bar. Defendant argues that, pursuant to the Supreme Court's analysis in *Sullivan*, attorney Cunningham gave the trial court adequate notice of his inability to serve both as attorney and witness for defendant. As a result, defendant contends, the trial court erred not only in failing to make adequate inquiry into any actual conflict of interest but also in failing to obtain a waiver from defendant of conflict-free representation before allowing attorney Cunningham to continue representing defendant.

Accordingly, we must consider whether, under the facts presented here, the opinions in *Holloway*, *Sullivan*, *Wood*, and *Mickens* (collectively, *Sullivan*) provide an appropriate framework for analysis of defendant's claims. When issues involving successive or simultaneous representation of clients in related matters have arisen before this Court, we have applied the *Sullivan* analysis rather than

**STATE v. PHILLIPS**

[365 N.C. 103 (2011)]

the *Strickland* framework to resolve resulting claims of ineffective assistance of counsel. *See, e.g., State v. Murrell*, 362 N.C. 375, 405, 665 S.E.2d 61, 81 (2008) (Defense counsel previously represented in a different case a witness testifying for the State in the case at bar.), *cert. denied,* —— U.S. ——, 173 L. Ed. 2d 1099 (2009); *State v. Bruton*, 344 N.C. 381, 391, 474 S.E.2d 336, 343 (1996) (One attorney represented codefendants at same trial.). Although the United States Supreme Court and North Carolina cases cited above vary in their details, each deals with concerns arising from multiple representation. The case at bar is different. Defendant does not contend counsel inappropriately engaged in concurrent or successive representation of other parties and him. Nevertheless, he argues that attorney Cunningham's decision not to withdraw and testify as a witness for defendant created an actual conflict of interest that should be analyzed under *Sullivan* rather than *Strickland*.

We find that *Strickland* provides the correct basis for our analysis. The Supreme Court observed in *Holloway* that defense counsel is in the best position to determine whether a conflict exists. 435 U.S. at 485-86, 55 L. Ed. 2d at 435. Attorney Cunningham apparently concluded no conflict existed, and defendant does not identify any conflicting interest of attorney Cunningham created by or arising from attorney Cunningham's continuing representation of defendant. Rather, defendant argues that his lead defense attorney violated Rule 3.7(a) of the North Carolina Rules of Professional Conduct, which states that:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

N.C. St. B. Rev. R. Prof. Conduct 3.7(a), 2010 Ann. R. N.C. at 842. Defendant contends that attorney Cunningham's alleged conflict arose from his responsibility to weigh the benefit of presenting evidence (his testimony) as a witness for defendant against his desire to continue representing defendant.

The applicability of the *Sullivan* line of cases has been carefully cabined by the United States Supreme Court. "The purpose of our

*Holloway* and *Sullivan* exceptions from the ordinary requirements of *Strickland* . . . is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Mickens*, 535 U.S. at 176, 152 L. Ed. 2d at 307. Here, unlike the circumstances posited in *Holloway* where counsel has been effectively silenced and any resulting harm difficult to measure, defendant has identified the single matter to which attorney Cunningham could have testified had he withdrawn as counsel. Because the facts do not make it impractical to determine whether defendant suffered prejudice, we conclude that *Strickland's* framework is adequate to analyze defendant's issue. Accordingly, we need not address defendant's additional arguments relating to the nature of the inquiry defendant claims the trial court should have pursued and to the knowing waiver of any conflict that defendant claims the trial court should have obtained from him, both of which are premised on the assumption that *Sullivan* applies.[5]

Under *Strickland*, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," we need not determine whether counsel's performance was deficient. 466 U.S. at 697, 80 L. Ed. 2d at 699. A defendant is prejudiced under *Strickland* when, looking at the totality of the evidence, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 80 L. Ed. 2d at 698; *see also Braswell*, 312 N.C. at 563, 324 S.E.2d at 248. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698. Defendant argues that attorney Cunningham's testimony regarding Chief McDonald's alleged statement would have had an effect on the outcome (1) at the hearing on defendant's suppression motion that he filed prior to trial, (2) during the guilt-innocence portion of the trial, and (3) during the sentencing proceeding. We consider each in turn.

Defendant first argues that attorney Cunningham's testimony relating to Chief McDonald's alleged comment would have affected the trial court's determination of the voluntariness of defendant's

---

5. Defendant cites *Wood*, 450 U.S. at 271, 67 L. Ed. 2d at 230, for the proposition that the trial court was obligated to make further inquiry after learning that attorney Cunningham did not plan to withdraw. Because we are proceeding under *Strickland*, we need not address this argument, but note that remand for such inquiry is unnecessary even under *Sullivan* when, as here, any adverse effect from an alleged attorney conflict of interest can be determined adequately from the record. *See Mickens*, 535 U.S. at 169-73, 152 L. Ed. 2d at 302-05.

STATE v. PHILLIPS

[365 N.C. 103 (2011)]

waiver of his *Miranda* rights when the court considered defendant's motion to suppress his statement. In his written motion to suppress, defendant argued that "extreme impairment of defendant's faculties by drug and alcohol use, combined with mental illness, rendered involun[tary] the defendant's waiver of his right to remain silent and his agreement to speak to off[ic]ers without advice of counsel." During an evidentiary hearing on this motion, Chief McDonald testified he spent roughly forty-five seconds in defendant's immediate presence before members of the Special Response Team swept into defendant's mother's residence and took defendant into custody. As to his alleged later conversation with attorney Cunningham regarding defendant's demeanor at the time of the encounter, Chief McDonald testified he did not recall telling attorney Cunningham that defendant "looked like he was stoned out of his mind," but did not deny making the statement. In its oral order denying defendant's motion to suppress, the trial court made extensive findings of fact and concluded as a matter of law that defendant's waiver of his *Miranda* rights was voluntary.

Among the trial court's findings of fact are that defendant appeared calm to Chief McDonald when they were together in the residence for not more than forty-five seconds; that defendant was sufficiently coherent to strike a potentially damaging sentence from his statement; that defendant had no difficulty providing his name, address, Social Security number, and date of birth; and that defendant did not appear to be under the influence of any impairing substance during the interview. In light of this and other evidence recited by the trial court in its findings of fact, we conclude that even if attorney Cunningham had withdrawn as counsel and testified that Chief McDonald told him defendant appeared to be "stoned out of his mind" at the time of their brief in-person encounter, there is no reasonable probability that this evidence would have persuaded the trial court that defendant's subsequent *Miranda* waiver was involuntary.

Defendant next argues that attorney Cunningham's testimony could have affected the jury verdict. During the guilt-innocence portion of his trial, defendant presented evidence that he was not guilty of first-degree murder based upon premeditation and deliberation. Specifically, this evidence indicated that defendant suffered diminished capacity stemming from the emotional repercussions of learning that his brother had been shot in the head, compounded by defendant's drug and alcohol consumption after being so informed. We have held that:

[A] specific intent to kill is a necessary ingredient of premeditation and deliberation. It follows, necessarily, that a defendant who does not have the mental capacity to form an intent to kill, or to premeditate and deliberate upon the killing, cannot be lawfully convicted of murder in the first degree [on the basis of premeditation and deliberation].

*State v. Cooper*, 286 N.C. 549, 572, 213 S.E.2d 305, 320 (1975) (internal citations omitted). Diminished mental capacity may be due to intoxication, disease, or some other cause. *Id.*

Consistent with his testimony during the pretrial suppression hearing, Chief McDonald testified during the guilt-innocence portion of defendant's trial that he did not recall, but also did not deny, stating to attorney Cunningham that defendant was "wired" and "stoned out of his mind." His recollection was not refreshed when he was confronted with attorney Cunningham's notes. Considered in light of other evidence of defendant's state of mind, Chief McDonald's impression of defendant's condition at the time of his arrest bore scant relevance to the jury's determination of defendant's mental condition hours earlier when the killings occurred. Cooke, an eyewitness to and victim of defendant's actions, testified that at the time of the murders, defendant's words were understandable and that "[h]e was fine," and "he knew what he was doing." In addition, although defendant's expert, Dr. Artigues, testified that defendant told her he attempted to kill himself by taking an overdose of the antidepressant imipramine after shooting the victims, she acknowledged that his drug ingestion following the killings had no relevance to defendant's mental capacity at the time of the killings. Accordingly, we see no reasonable probability that the jury would have reached a different verdict had attorney Cunningham withdrawn as counsel and testified to his recollection of Chief McDonald's comment.

Finally, defendant argues that attorney Cunningham's testimony could have affected the sentencing proceeding. For the reasons discussed above, we do not find that any testimony attorney Cunningham could have offered regarding Chief McDonald's limited observations of defendant long after the murders would have had an effect on the jury's findings regarding mitigating circumstances. Defendant has failed to show ineffective assistance of counsel. This assignment of error is overruled.

## GUILT-INNOCENCE

**[4]** Defendant argues the prosecution knowingly elicited or failed to correct false testimony, thereby denying him due process, his right to a jury trial, and freedom from cruel and unusual punishment, in violation of rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and by Article I, Sections 18, 19, 23, 24, and 27 of the North Carolina Constitution. Specifically, defendant contends that the State failed to correct false testimony given by Cooke regarding statements made by defendant while inside Ryals's residence around the time of the murders.

The record indicates that, in preparing for trial, agents of the State met with Cooke. Undated notes of a meeting between Cooke and Warren McSweeney, a prior prosecutor in this case, and notes of a 7 May 2007 meeting between District Attorney Maureen Krueger, Moore County District Attorney's Office Investigator Michael Kimbrell, and Cooke, all indicate Cooke related that defendant said he had "nothing to live for" because of his brother's death. In addition, Investigator Kimbrell testified at trial that during an 11 June 2007 interview, Cooke told him that "[defendant] kept repeating they killed his brother and he didn't have anything to live for." However, during her direct examination at defendant's trial, Cooke testified as follows:

> [Krueger:] Can you tell, to the best of your recollection, what [defendant] said? Tell the jurors what he said about why he needed money.

> [Cooke:] Well, he was not speaking to me. He was speaking to Renee McLaughlin and Sean Ray about the fact that he had gotten in debt with a drug dealer and they were going to kill him, if he did not come up with their money.

> . . . .

> [Krueger:] What comments, if anything, did the defendant make about a situation with his brother?

> [Cooke:] He just kept saying that his brother had been shot and, you know, he didn't have anything and that he had to come up with the money.

> [Krueger:] Did he say he didn't have anything to live for?

> [Cooke:] Not in those terms, no.

Defendant asserts that Cooke's trial testimony was false because it contradicted the notes made of her pretrial statements and that the State benefitted in both the guilt-innocence and penalty portions of the trial because Cooke's trial testimony tended to "paint [defendant] as a cold-blooded killer" motivated by the need for money "rather than as a man distraught over the shooting of his brother."

"When the State obtains a conviction through the use of evidence that its representatives know to be false, the conviction violates the Due Process Clause of the Fourteenth Amendment." *Wilkerson,* 363 N.C. at 402-03, 683 S.E.2d at 187 (citations omitted). The violation also occurs if the State fails to correct material testimony it knows to be false. *State v. Allen,* 360 N.C. 297, 304-05, 626 S.E.2d 271, 279, *cert. denied,* 549 U.S. 867, 166 L. Ed. 2d 116 (2006). To establish materiality, a defendant must show a " 'reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Id.* at 305, 626 S.E.2d at 279 (quoting *State v. Williams,* 341 N.C. 1, 16, 459 S.E.2d 208, 217 (1995), *cert. denied,* 516 U.S. 1128, 133 L. Ed. 2d 870 (1996)). "Evidence that affects the jury's ability to assess a witness' credibility may be material." *Wilkerson,* 363 N.C. at 403, 683 S.E.2d at 187 (citation omitted). "Thus, [w]hen a defendant shows that testimony was in fact false, material, and knowingly and intentionally used by the State to obtain his conviction, he is entitled to a new trial." *Williams,* 341 N.C. at 16, 459 S.E.2d at 217 (alteration in original) (internal quotation marks omitted) (quoting *State v. Sanders,* 327 N.C. 319, 336, 395 S.E.2d 412, 423 (1990), *cert. denied,* 498 U.S. 1051, 112 L. Ed. 2d 782 (1991)). However, we have distinguished between "the knowing presentation of false testimony and knowing that testimony conflicts in some manner." *Allen,* 360 N.C. at 305, 626 S.E.2d at 279. The latter merely presents a question of fact within the province of the jury. *Id.*

Although Cooke's trial testimony is inconsistent with the notes taken by others during her pretrial interviews, the record does not establish whether Cooke's direct testimony was inaccurate, whether her pretrial interview statements were inaccurate, whether the notes of those interviews were inaccurate, or whether Cooke's recollection changed. At any rate, it is not apparent that Cooke testified falsely at trial or that her trial testimony conflicted in any material way with her pretrial statements. Moreover, any inconsistency was addressed in the presence of the jury by Cooke's subsequent cross-examination when she made the following pertinent clarification:

[Attorney Cunningham:] You testified that you do not recall [defendant] saying anything about I have nothing left to live for?

[Cooke:] Not on those terms, no.

[Attorney Cunningham:] Do you remember telling [Investigator] Kimbrell in this year that [defendant's] brother had been shot and he had nothing left to live for?

[Cooke:] I don't think that I put it quite that way, but I might have, but that is not the way that [defendant] actually, you know, said it.

*See Wilkerson*, 363 N.C. at 404, 683 S.E.2d at 188 (finding that "jurors had ample evidence with which to assess [the] credibility" of a witness when that witness's direct testimony was clarified on cross-examination to reflect accurately the witness's incentive to testify). Finally, even assuming *arguendo* that Cooke perjured herself at trial, there is no indication in the record that the State knew her testimony was false. This assignment of error is overruled.

**[5]** Defendant next argues the trial court committed plain error by failing to instruct the jury that prior statements by Detectives Langford and Davis could be considered for the truth of the matters asserted, on the grounds that these statements were admissions of a party opponent. In the alternative, defendant contends that his attorney's failure to object to the instruction given by the court pertaining to the jury's consideration of prior inconsistent statements, and his attorney's failure to tender a correct instruction, deprived him of effective assistance of counsel.

The statements at issue were made before trial by Detectives Langford and Davis and related to defendant's behavior and demeanor as they transported him to the Moore County Sheriff's Office after his arrest. At trial, Detective Langford testified that defendant "was leaning forward and in an excited manner" while in the car; that upon their arrival at the sheriff's office, Detective Davis told defendant to wipe some saliva off his mouth; and that defendant did not appear to be under the influence of drugs, alcohol, or any other impairing substance. When cross-examined, Detective Langford admitted that he had previously described defendant in a written statement as "talking wildly" and apparently "high on something." Detective Langford also conceded that, when asked at an earlier hearing if "it appeared to you that [defendant] was high on cocaine or some kind of drug," he had answered, "It did." Detective

Langford further stated during cross-examination that he recalled Detective Davis's describing defendant as "foaming at the mouth."

Later, when Detective Davis testified at defendant's trial, he stated in his direct examination that during the ride to the station defendant was "highly excited. He—he was looking around and he appeared to be nervous or scared." On cross-examination, Detective Davis admitted that he had previously testified that defendant was "sweating a lot and acting very paranoid, looking around a lot."

In its instructions at the conclusion of the guilt-innocence portion of defendant's trial, and later again at the conclusion of the sentencing proceeding, the trial court instructed the jury:

> When evidence has been received to show that at an earlier time a witness made a statement which may be consistent or may conflict with the witness's testimony at this trial, you must not consider such earlier statement as evidence of the truth of what was said at that earlier time because it was not made under oath at this trial.

> If you believe that such earlier statement was made and that it is consistent or does conflict with the testimony of the witness at this trial, then you may consider this together with all other facts and circumstances bearing upon the witness's truthfulness in deciding whether you will believe or disbelieve the witness's testimony at this trial.

Although defendant did not raise a contemporaneous objection, he now argues that this instruction was erroneous. Defendant contends that the detectives' pretrial statements and hearing testimony were admissions of a party opponent and that the jury could consider them for the truth of the matters asserted, pursuant to the hearsay exception found in N.C.G.S. § 8C-1, Rule 801(d). Defendant argues that the trial court's error prejudicially affected the jurors' deliberations both at the guilt-innocence portion of the trial and at the sentencing proceeding.

This Court has not yet considered whether statements by law enforcement officers acting as agents of the government and concerning a matter within the scope of their agency or employment constitute admissions of a party opponent under N.C.G.S. § 8C-1, Rule 801(d) for the purpose of a criminal proceeding. *Cf. State v. Villeda,* 165 N.C. App. 431, 432-34, 436-37, 599 S.E.2d 62, 63-64, 65-66 (2004) (out-of-court statements of a Highway Patrol Trooper concerning his

subjective opinions about the habits of Hispanic drivers held to be admissions within the meaning of Rule 801(d)). We need not address this issue now because, even assuming *arguendo* that the statements and testimony were admissible under the exception, defense counsel neither asked the court to instruct the jury that such statements could be considered substantively nor objected to the jury instruction that was given, which limited consideration of prior inconsistent statements to impeachment purposes only. Consequently, as defendant concedes, we apply plain error analysis. N.C. R. App. P. 10(c)(4); *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (alteration in original) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnotes omitted), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)).

While the words and phrases used by Detectives Langford and Davis in their pretrial statements and pretrial testimony painted a somewhat more vivid picture of defendant's emotional and physical state at the time of his arrest than did their trial testimony, those terms bore no relation to defendant's condition at the time of the murders. As detailed above, Dr. Artigues, defendant's expert, differentiated between defendant's mental state when the killings took place and at the later time when he was taken into custody. Dr. Artigues attributed this difference, at least in part, to the consumption of additional drugs that defendant told her he took in those intervening hours. Detectives Langford and Davis did not observe defendant until at least four hours after the killings and after defendant's apparent additional drug ingestion. As a result, the detectives' impressions of defendant at the time he was taken into custody were

not especially probative of defendant's mental state at the time the crimes were committed and also were not relevant to a determination of whether the State had met its burden of proof in establishing aggravating circumstances. Therefore, we find that the trial court's failure to instruct *ex mero motu* that the statements of Detectives Langford and Davis could be considered for the truth of the matter asserted did not constitute plain error. Moreover, we conclude that even if the jury had been so instructed, no reasonable probability exists that the jury would have reached a different verdict or recommended a different sentence. *See, e.g., State v. Bell*, 359 N.C. 1, 34, 603 S.E.2d 93, 115 (2004), *cert. denied*, 544 U.S. 1052, 161 L. Ed. 2d 1094 (2005) (no plain error when there was not a "reasonable probability" of a different outcome had the error not occurred).

**[6]** Defendant argues in the alternative that trial counsel failed to provide effective assistance because counsel did not object to the instruction that was given and also did not tender a proposed instruction that defendant contends correctly sets out the law. To prevail on an ineffective assistance of counsel claim, defendant must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693; *accord Braswell*, 312 N.C. at 562-63, 324 S.E.2d at 248. For the reasons stated above, defendant has failed to establish prejudice resulting from the alleged errors. This assignment of error is overruled.

**[7]** Defendant next makes the somewhat related argument that the trial court erred in its treatment of inconsistent statements made by witnesses. Specifically, in addition to the purportedly inconsistent testimony of Detectives Langford and Davis detailed above, defendant contends that Cooke's pretrial statements to investigators were inconsistent with her trial testimony concerning the frequency of defendant's visits to the victim's residence, the reason defendant came to the victim's residence the day of the murders, and whether defendant said that he had nothing to live for. Although the trial court instructed that the jury could consider the discrepancies between the trial testimony of each of these witnesses and their earlier statements for the purpose of determining the credibility of the witnesses, defendant contends that the trial court's failure to admit these prior inconsistent statements as substantive evidence deprived him of his rights to present a defense, trial by jury, due process, and freedom from cruel and unusual punishment. Defendant also argues that defense counsel's failure to object to the admission of these state-

ments for only limited purposes constituted ineffective assistance of counsel.

Although defendant claims that the denial of constitutional rights is reviewed de novo, the record does not indicate that these issues were raised below. This Court has previously stated that "failure to raise a constitutional issue at trial generally waives that issue for appeal." *State v. Wilson*, 363 N.C. 478, 484, 681 S.E.2d 325, 330 (2009) (citing *State v. Ashe*, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985)); *see* N.C. R. App. P. 10(b)(1). Accordingly, we will consider only defendant's argument as it relates to whether counsel was ineffective.

Defendant contends he was denied effective assistance of counsel on the grounds that defense counsel should have argued that the witnesses' out-of-court statements, which were inconsistent with their trial testimony, were admissible as substantive evidence. To have made such an argument, defense counsel would have had to have taken a position contrary to the existing law of North Carolina. "[A] statement, other than one made by the declarant while testifying at the trial . . . offered in evidence to prove the truth of the matter asserted" is hearsay. N.C.G.S. § 8C-1, Rule 801(c) (2009). Hearsay is inadmissible unless an evidentiary rule or statute otherwise provides, *id.* Rule 802 (2009), and no rule or statute in North Carolina applies here to allow this evidence to be admitted substantively, *see State v. Williams*, 355 N.C. 501, 533, 565 S.E.2d 609, 628 (2002) ("[I]t has been established that prior inconsistent statements may not be used as substantive evidence." (citation omitted)), *cert. denied*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003). Although defendant argues that the prior inconsistent statements at issue would be admissible as substantive evidence in at least eighteen other jurisdictions, we do not believe that, to avoid being ineffective, defense counsel is required to argue a position untenable under existing North Carolina law. In other words, the failure to object to this long-standing evidentiary rule was not objectively unreasonable. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693. This assignment of error is overruled.

[8] Defendant next contends that the trial court committed plain error in admitting certain testimony by Cooke. During her direct examination, Cooke, who had been at Ryals's residence, witnessed defendant's actions there, and been shot and stabbed, gave the following testimony about defendant's actions and appearance during the shootings:

[Krueger:] Okay. And did—can you describe what [defendant's] demeanor was like? Was he angry or mad? What—what was his demeanor?

[Cooke:] He was fine. I mean it was—he had—he knew what he was doing. He had it planned out. It was a—he—he knew before he ever got there what was going to happen.

Defendant did not object but now argues that the testimony that defendant "had it planned out" and "knew before he ever got there what was going to happen" was improperly admitted because Cooke had no personal knowledge of any plans defendant might have formulated before he arrived at Ryals's residence.

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." N.C.G.S. § 8C-1, Rule 602 (2009). However, a lay witness may provide testimony based upon inference or opinion if the testimony is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." *Id.* Rule 701 (2009). This rule permits a witness to express "instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time. Such statements are usually referred to as shorthand statements of facts." *State v. Boyd,* 343 N.C. 699, 711, 473 S.E.2d 327, 333 (1996) (internal quotation marks omitted) (quoting *State v. Williams,* 319 N.C. 73, 78, 352 S.E.2d 428, 432 (1987)), *cert. denied,* 519 U.S. 1096, 136 L. Ed. 2d 722 (1997).

In *Boyd,* a murder case, a witness testified that "if [the defendant] gets me I know that he is going to kill everybody." 343 N.C. at 711, 473 S.E.2d at 332. The defendant argued that the statement, "I know that he is going to kill everybody," was speculative and should not have been admitted because the witness "did not know [the] defendant would kill anyone, much less everyone." *Id.* at 711, 473 S.E.2d at 333. The disputed testimony in *Boyd* was based on the witness's "opportunity to observe [the] defendant shoot his own father, holler at his own children, reload his weapon, and threaten to shoot [the witness]." *Id.* at 712, 473 S.E.2d at 333. We concluded that the witness's testimony that the defendant was "going to kill everybody" was an instantaneous conclusion as to the defendant's condition and state of mind and therefore "clearly" admissible lay testimony under Rule 701. *Id.* at 711-12, 473 S.E.2d at 333.

Immediately before her testimony at issue here, Cooke testified that defendant had said that "[h]e was in debt with somebody who he needed money for and that's why they came to Eddie's house," that the debt was "with a drug dealer and they were going to kill him, if he did not come up with their money," and that "his brother had been shot and he was dying and he had to get their money." In this context, Cooke's statements that defendant "had it planned out" and "knew before he ever got there what was going to happen" were helpful to an understanding of her testimony and were rationally based on her perceptions upon seeing defendant enter the residence; wait for Ryals to turn his back; shoot Ryals, Justice, and Harden; reload his pistol; order Hobson and her to lie on the floor; then shoot Hobson. Accordingly, this testimony was properly admitted.

Alternatively, defendant argues that defense counsel's failure to object to this testimony constituted ineffective assistance of counsel. Because the evidence was not erroneously admitted, defendant's argument fails. *See State v. Lee*, 348 N.C. 474, 492, 501 S.E.2d 334, 345 (1998). This assignment of error is overruled.

**[9]** Defendant contends that the trial court erred in denying his motion to dismiss all first-degree kidnapping charges on grounds that the State failed to present either direct or circumstantial evidence of lack of parental consent. When the victim is less than sixteen years old, the crime of first-degree kidnapping requires the State prove that the defendant did "unlawfully confine, restrain, or remove [the victim] from one place to another . . . without the consent of a parent or legal custodian." N.C.G.S. § 14-39(a) (2009); *see also State v. Hunter,* 299 N.C. 29, 40, 261 S.E.2d 189, 196 (1980) (discussing the element). After the State rested its case-in-chief, defendant moved to dismiss all kidnapping charges on the grounds that the State had failed to present evidence that Cooke's parents had not consented to her being taken. The State responded that defendant's actions and the circumstances of the case provided sufficient evidence to satisfy the element. The trial court denied defendant's motion and submitted first-degree kidnapping to the jury.

A defendant's motion to dismiss should be denied if, *inter alia,* "there is substantial evidence . . . of each essential element of the offense charged, or of a lesser offense included therein." *E.g., State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citations omitted). Whether the State pre-

sented substantial evidence of each essential element is a question of law. *State v. Olson*, 330 N.C. 557, 564, 411 S.E.2d 592, 595 (1992) (citation omitted). " 'In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences.' " *State v. Scott*, 356 N.C. 591, 596, 573 S.E.2d 866, 869 (2002) (quoting *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993)).

Cooke's parents did not testify, so there is no direct evidence of lack of parental consent. In addition, her parents were not at Ryals's residence when the events occurred, so defendant argues that they did not do or say anything from which a lack of consent can be inferred. However, the State presented evidence that, having shot and repeatedly stabbed Cooke while she was in Ryals's residence, defendant, McLaughlin, and Ray found her after she crawled outside and removed her from the yard for the stated purpose of killing her while she was incapable of escaping. They loaded Cooke into the bed of defendant's truck and drove to a trash pile, only to abandon her there when they heard sirens. The State argues that this circumstantial evidence of actions taken against Cooke was sufficient to establish lack of parental consent.

" 'Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances.' " *State v. Fritsch*, 351 N.C. 373, 379, 526 S.E.2d 451, 455 (quoting *Barnes*, 334 N.C. at 75, 430 S.E.2d at 919 (internal citations and quotation marks omitted)), *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). When a minor is taken for the purpose of killing her, as opposed to, for example, an alleged parental kidnapping, it is reasonable to infer that the minor's parents did not consent to the removal. Although defendant also argues that Cooke's parents were deficient in a number of respects, we fail to see the relevance of such evidence to the question of consent. Viewing the evidence in the light most favorable to the State, it was reasonable for the jury to find that Cooke's parents did not consent to her being taken by defendant. This assignment of error is overruled.

Defendant next argues that the trial court erred by failing to intervene *ex mero motu* at five separate points during the State's closing argument at the conclusion of the guilt-innocence portion of the trial.

Defendant contends that, considered either individually or cumulatively, the arguments constituted gross impropriety and required intervention by the trial court. Defendant seeks a new trial on the grounds that the court's errors violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 18, 19, 23, 24, and 26 of the North Carolina Constitution; and N.C.G.S. § 15A-1230. We will address each of defendant's contentions in turn.

Because defendant did not object to any of these arguments below, no constitutional argument could have been presented to the trial court. As noted above, failure to raise a constitutional issue at trial generally waives that issue for appeal. *Wilson*, 363 N.C. at 484, 681 S.E.2d at 330; *Ashe*, 314 N.C. at 39, 331 S.E.2d at 659. Accordingly, we will review these purported errors for a violation of N.C.G.S. § 15A-1230 ("Limitations on argument to the jury"). In conducting this review, we are mindful that "[g]enerally, 'prosecutors are given wide latitude in the scope of their argument' and may 'argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom.' " *State v. Goss*, 361 N.C. 610, 626, 651 S.E.2d 867, 877 (2007) (quoting *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709-10 (1995), *cert. denied*, 516 U.S. 1148, 134 L. Ed. 2d 100 (1996)), *cert. denied*, —— U.S. ——, 172 L. Ed. 2d 58 (2008). "Statements or remarks in closing argument 'must be viewed in context and in light of the overall factual circumstances to which they refer.' " *Id.* (quoting *Alston*, 341 N.C. at 239, 461 S.E.2d at 709).

Specifically,

"[i]n capital cases . . . an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it."

*State v. Rogers*, 355 N.C. 420, 462, 562 S.E.2d 859, 885 (2002) (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)).

In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have inter-

vened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002). To merit a new trial, "the prosecutor's remarks must have perverted or contaminated the trial such that they rendered the proceedings fundamentally unfair." *State v. Mann*, 355 N.C. 294, 307-08, 560 S.E.2d 776, 785 (citation omitted), *cert. denied*, 537 U.S. 1005, 154 L. Ed. 2d 403 (2002).

**[10]** Defendant first contends that the prosecutor mischaracterized statements by defendant's trial counsel. As part of defendant's trial strategy, he did not deny being guilty of second-degree murder. Instead, he contested the first-degree murder charges, claiming he suffered from diminished capacity at the time of the offenses. Consistent with that strategy, defendant's trial counsel said to prospective jurors during voir dire:

> This case is not going to be a whodunit. This is not—there is no issue about whether Mario Phillips did what he is accused of, did—did—I didn't say that right. I didn't say that right.
>
> There's no question that four people died as a result of Mario Phillips shooting them with a gun. It's that simple. Okay?

Shortly afterwards, defense counsel added that defendant "doesn't deny he is guilty of second-degree murder."

Later, during the State's closing argument at the conclusion of the guilt-innocence portion of the trial, the prosecutor said, "Now it was said during jury selection that the defendant admits that he's guilty of what he's charged with. I believe [defendant's counsel] said that." Defendant contends that the prosecutor's argument was a "blatant distortion" of defense counsel's words, suggesting that defendant's own counsel believed him to be guilty of first-degree murder, thereby misleading or prejudicing the jury.

The prosecutor's comment obviously overstated the extent of defense counsel's concession. However, while "[c]ounsel shall not knowingly misinterpret . . . the language or argument of opposite counsel," Gen. R. Pract. Super. & Dist. Cts. 12, para. 8, 2010 Ann. R. N.C. 10, we note that the prosecutor's comment was made days after defense counsel's misstatement during jury selection and could as easily have been the result of a memory lapse as a knowing misrepresentation. While the prosecutor's statement was legally incorrect

because defendant did not admit guilt to murder in the first degree, defendant nevertheless had conceded through counsel that he had killed. In addition, the prosecutor's very next words to the jury were: "Though there are admissions in this, the State must still prove the elements of these crimes. And the State has the burden of proof of beyond a reasonable doubt."

Thus, while the prosecutor's statement mischaracterized defendant's legal position, it was apparently a *lapsus linguae* that was neither calculated to mislead nor prejudicial in effect. The statement did not personally disparage defendant or defense counsel. *See Jones*, 355 N.C. at 133-34, 558 S.E.2d at 107-08 (finding gross impropriety where prosecutor called the defendant "mean," a "loser," and "worthless," among other epithets), *cert. denied*, 543 U.S. 1023, 160 L. Ed. 2d 500 (2004); *cf. State v. Sanderson*, 336 N.C. 1, 9-11, 442 S.E.2d 33, 38-40 (1994) (finding prejudice when prosecutor made abusive comments about defense counsel both in and outside the presence of the jury). While the State's comment, taken in isolation, could be understood to mean that defense counsel conceded defendant's guilt entirely, in light of all the arguments of the parties and the trial court's correct jury instructions regarding the elements of the different degrees of murder, we conclude that this brief misstatement did not rise to the level of gross impropriety necessitating the trial court's intervention *ex mero motu*.

[11] The second statement with which defendant takes issue is the prosecutor's remark about defendant's failure to introduce certain evidence related to his diminished capacity defense. During the State's case-in-chief, Chief McDonald testified that, shortly after the murders, defendant's mother spoke with defendant on the telephone at Chief McDonald's request, then told Chief McDonald that defendant would surrender to him. Although defendant's mother attended the trial, she was not called to testify. In her closing argument, the prosecutor stated:

> Now we know that the defendant intentionally talked to his mother [after the murders]. She's been here this whole time. Did she get up and tell you the defendant was incoherent when she talked to him, that the defendant went into a sudden fit of rage? Did his own mother who talked him into surrendering tell you how he was paranoid and was upset over [his brother] Julian? No.
>
> His own mother. If she had those things to tell you when her son is on trial, don't you think she would?

Defendant argues the prosecutor improperly speculated as to what defendant's mother knew about defendant's mental capacity on the day of the murders. In addition, defendant argues that the prosecutor improperly suggested that incoherence, continuing rage, or paranoia were symptoms of diminished capacity.

Addressing first the prosecutor's observation that defendant's mother failed to testify, we note that defendant presented evidence in his own behalf. We have held that "[t]he State is free to point out the failure of the defendant[] to produce available witnesses," *State v. Tilley*, 292 N.C. 132, 144, 232 S.E.2d 433, 441 (1977), and that "[t]he prosecution may argue that a defendant failed to produce a witness or other evidence to refute the State's case," *State v. Barden*, 356 N.C. 316, 359, 572 S.E.2d 108, 136 (2002) (citations omitted), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). *See also State v. Ward*, 338 N.C. 64, 100-01, 103, 449 S.E.2d 709, 729, 730-31 (1994) (finding no error when trial court did not intervene *ex mero motu* when the prosecutor in a capital case called attention to the defendant's failure to produce exculpatory evidence as forecast), *cert. denied*, 514 U.S. 1134, 131 L. Ed. 2d 1013 (1995). Chief McDonald's testimony about the telephone call between defendant and his mother indicated the existence of a witness who spoke with defendant shortly after the murders. The prosecutor's argument merely pointed out that a witness was available who could have corroborated defendant's defense, if that defense were valid.

As to defendant's contention that the prosecutor misstated the law on diminished capacity, we do not believe the jury would have interpreted the prosecutor's references to incoherence, rage, and paranoia as setting out elements of the defense. The trial court instructed the jury on diminished capacity and to the extent the prosecutor's argument could be construed as a misstatement of law, it was remedied by the trial court's correct jury instructions. *See State v. Price*, 344 N.C. 583, 594, 476 S.E.2d 317, 323-24 (1996) (citations omitted). Because the prosecutor's argument was not improper, the trial court had no basis for intervention *ex mero motu*.

[12] The third statement by the prosecutor of which defendant complains pertained to the credibility of Dr. Artigues, defendant's expert witness, who testified to defendant's diminished capacity. Referring to Dr. Artigues, the prosecutor stated that "[h]er description of diminished capacity over the course of two hours is wholly unbelievable." Shortly thereafter, the prosecutor added:

It is a little convenient on the behalf of Doctor Artigues that the defendant's diminished capacity only exists during the time of criminal liability, only from the time he pulled out the gun to the time he left Amanda [Cooke]. That's the only time. Before that he's not diminished; after that he's not diminished. I would say she's not very credible in that.

Defendant contends that in these statements the prosecutor impermissibly gave her personal opinion as to the credibility of this witness.

During closing argument an attorney "may not . . . express his personal belief as to the truth or falsity of the evidence." N.C.G.S. § 15A-1230(a) (2009). The prosecutor's flat statement that Dr. Artigues's testimony was "wholly unbelievable" was therefore improper. The subsequent remark that "I would say she's not very credible" when she testified that defendant suffered diminished capacity only during a short period is more ambiguous. The comment can be read either as a statement of the prosecutor's personal belief or as a contention to the jury. At any rate, the infelicitous phrasing skirts the strictures of the statute. However, defendant did not object to either comment. In light of the overwhelming evidence against defendant, we conclude that the prosecutor's remarks did not pervert or contaminate the trial to such an extent as to render the proceedings fundamentally unfair. *Mann*, 355 N.C. at 307-08, 560 S.E.2d at 785.

As to the prosecutor's criticism of the substance of Dr. Artigues's testimony, "[a]n attorney may, however, on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." N.C.G.S. § 15A-1230(a). Generally, "it is not improper for the prosecutor to impeach the credibility of an expert during his closing argument." *State v. Campbell*, 359 N.C. 644, 677, 617 S.E.2d 1, 22 (2005) (citation and quotation marks omitted), *cert. denied*, 547 U.S. 1073, 164 L. Ed. 2d 523 (2006); *see also State v. Sexton*, 336 N.C. 321, 363, 444 S.E.2d 879, 903 (noting that the prosecutor "can argue to the jury that they should not believe a witness" (citations and quotation marks omitted)), *cert. denied*, 513 U.S. 1006, 130 L. Ed. 2d 429 (1994). The prosecutor sought to impeach Dr. Artigues's expert opinion that defendant suffered from diminished capacity by pointing out that the doctor's opinion covered only the relatively short span while defendant was committing criminal acts. The prosecutor contended both that Dr. Artigues's diagnostic sharpshooting in establishing the precise time of defendant's purported disability was

not credible and that defendant's actions during and after the killings were not consistent with her diagnosis. Accordingly, the prosecutor's reference to the "convenience" of Dr. Artigues's testimony was not grossly improper and the court was not required to intervene *ex mero motu*.

**[13]** The fourth statement at issue from the guilt-innocence closing argument also involved the prosecutor's discussion of defendant's diminished capacity defense. Specifically, the prosecutor argued:

> If we had one shred of evidence that [defendant] did anything to help these victims—anything—one small thing—you might have diminished capacity.

> If you had one shred of evidence to show he reflected and was sorry and said I—I hate that I've done this, I can't believe that I've done this—You never heard anyone say that he said I can't believe I've done this. What he did was he hit [Ryals] and he beat [Ryals] and he demanded drugs and money and then he set the house on fire.

> These things are totally inconsistent with diminished capacity.

Defendant contends that this statement misled the jury into believing that diminished capacity was not established because the defense failed to prove remorse or efforts to assist the victims.

The diminished capacity defense to first-degree murder on the basis of premeditation and deliberation requires proof of an inability to form the specific intent to kill. *Cooper*, 286 N.C. at 572, 213 S.E.2d at 320. We do not interpret the prosecutor's argument as requiring defendant to provide any additional proof. Instead, the prosecutor was pointing out aspects of defendant's conduct that she contended were inconsistent with diminished capacity. "An attorney may . . . on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." N.C.G.S. § 15A-1230(a). Any impropriety in the argument was cured by the court's correct jury instructions on diminished capacity. *See Price*, 344 N.C. at 594, 476 S.E.2d at 323-24.

**[14]** Fifth, defendant contends that the prosecutor misstated the law as to the intent required to prove first-degree murder on the basis of premeditation and deliberation when the prosecutor argued:

So we come to the question of intent and premeditation and deliberation versus diminished capacity. Our actions speak louder than words. We do the things we intend to do.

. . . .

It doesn't make sense, if you're talking about diminished capacity, that you then would proceed to rob somebody. Our actions mean something. If I rob you, I've intended to rob you. I don't commit a diminished capacity murder and then suddenly decide I'm going to rob you.

Defendant contends that this argument impermissibly relieved the State of the burden of proving the element of intent.

To prove the specific intent element of first-degree murder based upon premeditation and deliberation, the State must show not only an intentional act by the defendant that caused death, but also that "the defendant intended for his action to result in the victim's death." *State v. Keel*, 333 N.C. 52, 58, 423 S.E.2d 458, 462 (1992). When, as here, the defendant claims diminished capacity, the jury must decide whether the defendant was able to form the required specific intent. As the trial judge correctly stated in his subsequent instructions to the jury, "[i]ntent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred." It follows that the State may rebut a claim of diminished capacity by pointing to actions by a defendant before, during, and after a crime that indicate the existence of, or are consistent with, specific intent. *See State v. Jones*, 358 N.C. 330, 351, 595 S.E.2d 124, 137 (prosecutor's response to a defense of diminished capacity held proper when based upon reasonable inferences drawn from the evidence), *cert. denied*, 543 U.S. 1023, 160 L. Ed. 2d 500 (2004).

The two comments highlighted by defendant were part of a lengthy rebuttal of the diminished capacity defense. During this argument, the prosecutor stated, "You look at someone's actions before an event, during an event, and after an event to determine what is it that they mean," then described numerous actions defendant took around the time of the murders and contended that each was intentional. The two comments at issue served to rebut defendant's diminished capacity defense by arguing reasonable inferences from defendant's actions. The prosecutor never argued that the jury was relieved of its burden to find defendant had specific intent to commit the offenses. Given the wide latitude afforded to counsel during closing arguments, we do not find the statements to be improper, much

less grossly so. Cases cited by defendant relating to a judge's jury instructions that were found to relieve the prosecution of its burden of proving intent are inapposite to our analysis of this closing argument. *Cf. Sandstrom v. Montana*, 442 U.S. 510, 512, 521, 61 L. Ed. 2d 39, 43, 49 (1979) (concluding that jury instruction stating that "the law presumes that a person intends the ordinary consequences of his voluntary acts" violates the Fourteenth Amendment by relieving the State of its burden of proof as to a defendant's state of mind (internal quotation marks omitted)); *Morissette v. United States*, 342 U.S. 246, 249, 273-76, 96 L. Ed. 288, 293, 306-07 (1952) (reversing conviction when trial court instructed that felonious intent was presumed by the defendant's mere act of taking certain property). Even assuming *arguendo* that the prosecutor's statements were improper, any error was cured by the trial court's correct jury instructions. *E.g., State v. Trull*, 349 N.C. 428, 452, 509 S.E.2d 178, 194 (1998) (citation omitted), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80 (1999).

Based on the record, we conclude that these statements made during the prosecutor's closing argument in the guilt-innocence portion of defendant's trial, considered both individually and cumulatively, were not so grossly improper as to have required the trial court to intervene *ex mero motu*. These assignments of error are overruled.

## SENTENCING PROCEEDING

**[15]** Defendant contends the trial court erred by failing to intervene *ex mero motu* when the prosecutor discussed the role of mercy during the State's closing argument at the conclusion of the sentencing proceeding:

> We look at the law and at the facts, the facts as you decided them to be, and not our feelings and not our hearts to decide whether or not death is the just verdict.
>
>     . . . .
>
> The facts of this case—the facts of this case demand one verdict and that is death.
>
> Your hearts may tell you to be merciful even though the defendant was not. But we are not bound by mercy in this courtroom. We're not bound by our hearts. We're bound by duty.

Defendant contends that the prosecutor erroneously called upon the jury to disregard mercy altogether, thereby contaminating the jury's weighing of aggravating and mitigating circumstances.

**STATE v. PHILLIPS**

[365 N.C. 103 (2011)]

"The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *Jones*, 355 N.C. at 133, 558 S.E.2d at 107 (citation omitted). Prosecutors generally are afforded wide latitude in closing argument. *E.g.*, *Goss*, 361 N.C. at 626, 651 S.E.2d at 877. Remarks that do not draw a contemporaneous objection are viewed in context and constitute reversible error only when they have made the proceedings fundamentally unfair. *Mann*, 355 N.C. at 307-08, 560 S.E.2d at 785.

This Court has held that in sentencing proceeding closing arguments prosecutors may " 'argue to the sentencing jury that its decision should be based not on sympathy, mercy, or whether it wants to kill the defendant, but on the law.' " *State v. Cummings*, 361 N.C. 438, 469, 648 S.E.2d 788, 806 (2007) (quoting *State v. Frye*, 341 N.C. 470, 506, 461 S.E.2d 664, 683 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996)), *cert. denied*, 552 U.S. 1319, 170 L. Ed. 2d 760 (2008). We also have upheld a prosecutor's sentencing proceeding closing argument "admonishing the jurors that feelings of sympathy and forgiveness rooted in their hearts and not also in the evidence may not be permitted to affect their verdict." *State v. Price*, 326 N.C. 56, 88, 388 S.E.2d 84, 102, *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990); *see also State v. Rouse*, 339 N.C. 59, 93, 451 S.E.2d 543, 561 (1994) (noting that "the prosecutor may discourage the jury from having mere sympathy not related to the evidence in the case affect its decision" (citation omitted)), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995), *and overruled in part on other grounds by State v. Hurst*, 360 N.C. 181, 198-99, 624 S.E.2d 309, 322-23, *cert. denied*, 549 U.S. 875, 166 L. Ed. 2d 131 (2006).

The arguments in question, cautioning jurors against reaching a decision on the basis of their "feelings" or "hearts," did not foreclose considerations of mercy or sympathy. Instead, the prosecutor asked the jury not to impose a sentence based on emotions divorced from the facts presented in the case. In addition, during the argument the prosecutor also urged the jury to base its decision on "the evidence in this case" and to consider that it had already "decided what the true facts are," while reminding the jury that the trial court would instruct on the applicable law. Because this argument was not improper, the trial court did not err by failing to intervene *ex mero motu*. This assignment of error is overruled.

**[16]** In a related argument, defendant contends that his trial counsel's failure to object to several portions of the State's closing arguments both at the guilt-innocence portion of the trial and at the sentencing proceeding constituted ineffective assistance of counsel because, in the absence of an objection, defendant has had to argue that admission of the allegedly improper statements was plain error. However, as noted above, when trial counsel fails to raise a timely objection to opposing counsel's closing argument, we do not review for plain error, but instead determine whether the comments were so grossly improper that the trial court failed to intervene *ex mero motu*. *Jones*, 355 N.C. at 133, 558 S.E.2d at 107. Such remarks constitute reversible error only when they render the proceeding fundamentally unfair. *Mann*, 355 N.C. at 307-08, 560 S.E.2d at 785. In addition to his counsel's failure to object to the arguments discussed above, defendant also asserts that defense counsel was ineffective for failing to object to the prosecutor's arguments that: (1) the jury should answer Issue Three "Yes" if it found that aggravating and mitigating circumstances have equal weight; (2) the jury had already found the aggravating factors by virtue of its guilty verdicts; and (3) the jury is the voice and conscience of the community. We consider below in the "Preservation" portion of this opinion whether these additional arguments constituted reversible error and find that they do not. Defendant now contends that he is entitled to relief on grounds of ineffective assistance of counsel based upon counsel's failure to object to each of these arguments. Defendant adds that if the record contains insufficient information on which to resolve his claims, we should dismiss the assignment of error without prejudice to raise these matters in the trial division by means of a motion for appropriate relief.

Ineffective assistance of counsel "claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001) (citations omitted), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002). The incidents that defendant here argues constitute ineffective assistance of counsel may be determined from the record on appeal, so we can address them on the merits without the necessity to remand for an evidentiary hearing.

To demonstrate prejudice when raising an ineffective assistance of counsel claim, defendant must show that based on the totality of

the evidence there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698; *see also Braswell*, 312 N.C. at 563, 324 S.E.2d at 248. After having reviewed each of these arguments for substantive error, we found that none was so grossly improper as to render defendant's trial fundamentally unfair. We now further conclude that a reasonable probability does not exist that the outcome of the trial would have been different had defense counsel objected to these arguments. Accordingly, trial counsel's failure to object to these arguments is not ineffective assistance of counsel. This assignment of error is overruled.

Defendant's next issues relate to two mitigating circumstances that the trial court submitted to the sentencing jury. The trial court submitted the N.C.G.S. § 15A-2000(f)(1) circumstance, that "defendant has no significant history of prior criminal activity," and, with respect to the murder of Hobson, the N.C.G.S. § 15A-2000(f)(4) circumstance, that "defendant was an accomplice in or accessory to the capital felony committed by another person and his participation was relatively minor." Defendant asserts that the State's closing argument in the sentencing proceeding used the submission of these mitigating circumstances to ridicule defendant and undermine all of defendant's mitigating evidence. Defendant argues that the trial court erred in submitting these mitigating circumstances because they were not supported by the evidence but, conceding that each was requested by defendant's trial counsel, adds that the record suggests that in making the requests, counsel failed to provide effective assistance.

**[17]** We consider first the (f)(1) mitigating circumstance. We have held that if this circumstance is erroneously submitted to the jury upon the defendant's request, we review for invited error. *State v. Polke*, 361 N.C. 65, 70-71, 638 S.E.2d 189, 192-93 (2006), *cert. denied*, 552 U.S. 836, 169 L. Ed. 2d 55 (2007). However, we first must make the threshold inquiry whether the circumstance was supported by evidence in the record. N.C.G.S. § 15A-2000(b) (2009). If so, its submission was not error.

During a recess in the sentencing proceeding, the State informed the court that it possessed documentation of defendant's prior criminal convictions. These were felony breaking and entering in 1999, felony larceny in 1998, driving under the influence in 1996, larceny in 1993, sale of marijuana in 1991, and sale of a narcotic or controlled substance in 1990. Although defense counsel responded that he did not intend to ask the trial court to submit the (f)(1) mitigating cir-

cumstance, the prosecutor reminded the judge that the law might require submission of the circumstance even in the absence of a request if the record supported its submission. After overnight consideration, defense counsel moved to renumber the documents as defense exhibits and introduce them in its own case during the sentencing proceeding in support of the (f)(1) mitigating circumstance. These documents were received in evidence by the trial court, and at the charge conference defendant specifically asked for the (f)(1) instruction. During its sentencing proceeding closing argument, the State contended to the jury that defendant's prior convictions were in fact significant and that the jury should not find the (f)(1) mitigating circumstance. No juror found that the (f)(1) circumstance applied.

In discussing a capital defendant's criminal history, we have held that "[i]f the trial court determines that a rational jury could find that defendant had no significant history of prior criminal activity," the trial court must submit the (f)(1) mitigating circumstance to the jury. *Barden*, 356 N.C. at 372, 572 S.E.2d at 143 (citation omitted). "Significant" in this context means "likely to have influence or effect upon the determination by the jury of its recommended sentence." *State v. Walls*, 342 N.C. 1, 56, 463 S.E.2d 738, 767 (1995) (citation omitted), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). "[A]ny reasonable doubt regarding the submission of a statutory or requested mitigating factor [must] be resolved in favor of the defendant." *State v. Brown*, 315 N.C. 40, 62, 337 S.E.2d 808, 825 (1985) (citation omitted), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *and overruled in part on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

Defendant's prior convictions were somewhat remote in time and do not appear to involve violence against a person. *See State v. Fletcher*, 348 N.C. 292, 325-26, 500 S.E.2d 668, 687-88 (1998) (citing cases in which the trial court properly concluded that submission of the (f)(1) mitigating circumstance was proper while listing the age and nature of each defendant's prior offenses), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999). We conclude that evidence in the record supported the trial court's decision to give the instruction. Because the instruction was proper, defense counsel did not invite error and did not provide ineffective assistance by moving that it be given.

[18] Turning to defendant's argument regarding the applicability of the (f)(4) mitigating circumstance in relation to the murder of Hobson, we have held that, to warrant submission of this mitigating

circumstance, "it is necessary that there be evidence tending to show (1) that defendant was an accomplice in or an accessory to the capital felony committed by another, and (2) that his participation in the capital felony was relatively minor." *State v. Stokes*, 308 N.C. 634, 656, 304 S.E.2d 184, 197 (1983). The evidence at trial indicated that defendant shot Hobson in the neck, although Hobson's death resulted from stab wounds to the chest inflicted by Ray at defendant's instruction. The doctor who performed the autopsy testified that the bullet wound was not fatal, but would have caused temporary paralysis and, if not treated, may have resulted in permanent paralysis. The State later argued to the jury that it should not find the (f)(4) mitigating circumstance because defendant was a major participant in Hobson's murder. No juror found the (f)(4) mitigating circumstance.

A judge in a capital case shall instruct "the jury that it must consider any . . . mitigating circumstance or circumstances . . . which may be supported by the evidence." N.C.G.S. § 15A-2000(b). "[A] trial court has no discretion in determining whether to submit a mitigating circumstance when 'substantial evidence' in support of the circumstance has been presented." *State v. Watts*, 357 N.C. 366, 377, 584 S.E.2d 740, 748 (2003) (quoting *State v. Fletcher*, 354 N.C. 455, 477, 555 S.E.2d 534, 547 (2001), *cert. denied*, 537 U.S. 846, 154 L. Ed. 2d 73 (2002)), *cert. denied*, 541 U.S. 944, 158 L. Ed. 2d 370 (2004). Although the violence defendant inflicted on this victim was, whether by design or by chance, less than the violence inflicted by defendant on the others, we are unable to conclude that defendant's actions in shooting Hobson in the neck and instructing Ray to inflict the stab wounds that proved fatal, constituted relatively minor participation. The (f)(4) mitigating circumstance was not supported by substantial evidence.

Consequently, the trial court erred in providing the (f)(4) instruction to the jury. However, we have held that, "[a]bsent extraordinary facts . . . , the erroneous submission of a mitigating circumstance is harmless." *State v. Bone*, 354 N.C. 1, 16, 550 S.E.2d 482, 492 (2001) (alterations in original) (citations and quotation marks omitted), *cert. denied*, 535 U.S. 940, 152 L. Ed. 2d 231 (2002). Although defendant argues that he was prejudiced by the State's ridicule of this mitigating circumstance, in light of the facts of this case, where defendant not only killed three victims himself but shot and directed the fatal stabbing of the fourth, we are convinced that the outcome would not have been different if the trial court had withheld the instruction. In the absence of "extraordinary facts," we conclude that the trial court's

error, whether invited or not, was harmless. Accordingly, defense counsel's request for an instruction that did no harm and did not prejudice defendant, *see Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698; *see also State v. Braswell*, 312 N.C. at 563, 324 S.E.2d at 248, did not constitute ineffective assistance.

## PRESERVATION ISSUES

Defendant raises three additional issues that he concedes have previously been decided by this Court contrary to his position. First, defendant contends that the trial court erred by not intervening *ex mero motu* during the State's closing argument in the sentencing proceeding when the prosecutor incorrectly indicated to the jurors that if they found the mitigating and aggravating circumstances listed on Issue Three of the Issues and Recommendation Form to be in equipoise, they must answer Issue Three "Yes" and proceed to Issue Four. However, the trial court properly instructed the jury on its responsibilities when considering Issue Three, curing the misstatement. Defendant acknowledges that this issue has been decided against him. *State v. Taylor*, 362 N.C. 514, 554, 669 S.E.2d 239, 270 (2008), *cert. denied*, —— U.S. ——, 175 L. Ed. 2d 84 (2009).

Second, defendant argues the trial court erred by failing to intervene *ex mero motu* when the prosecutor argued during its sentencing proceeding closing statement that by virtue of its verdicts in the guilt-innocence portion of the trial, the jury had already found the aggravating circumstances pertaining to "course of conduct" and "pecuniary gain." As defendant acknowledges, this Court has previously held such statements, especially when followed by proper jury instructions, do not rise to the level of gross impropriety. *Id.* at 552, 669 S.E.2d at 269; *accord Barden*, 356 N.C. at 366, 572 S.E.2d at 140 (no prejudicial error found in similar statement by prosecutor regarding the pecuniary gain aggravator).

Third, defendant contends the State's allusion to the jury as the "voice of the community" improperly focused attention on community expectations. This Court has repeatedly upheld such characterizations. *State v. Nicholson*, 355 N.C. 1, 43-44, 558 S.E.2d 109, 138, *cert. denied*, 537 U.S. 845, 154 L. Ed. 2d 71 (2002); *State v. Scott*, 314 N.C. 309, 311-12, 333 S.E.2d 296, 298 (1985). We have considered defendant's arguments on these issues and decline to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[19] As required by N.C.G.S. § 15A-2000(d)(2), we now consider whether the record supports the aggravating circumstances found by the jury, whether the death sentence "was imposed under the influence of passion, prejudice, or any other · arbitrary factor," and whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2009).

We begin with the aggravating circumstances. Defendant was convicted of four counts of first-degree murder both on the basis of malice, premeditation, and deliberation and under the felony murder rule. He also was convicted of first-degree kidnapping, assault with a deadly weapon with intent to kill inflicting serious injury, attempted first-degree murder, robbery with a firearm, and first-degree arson. The trial court submitted two aggravating circumstances for the jury's consideration: (1) the murder was committed for pecuniary gain, pursuant to section 15A-2000(e)(6); and (2) the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, pursuant to section 15A-2000(e)(11). The jury found both of these aggravating circumstances to exist beyond a reasonable doubt. Our review of the record indicates that both circumstances were fully supported by the evidence presented at trial.

Although defendant contends that the death sentence was imposed under the influence of passion and prejudice and that other alleged errors at trial discussed above left the jury no choice but to base its decision on emotion rather than reason, we detect no indication anywhere in the record that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

In conducting our proportionality review, we determine whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.* § 15A-2000(d)(2). We compare this case with those in which we have determined the death penalty was disproportionate. This Court has held the death penalty to be disproportionate in eight cases: *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d

713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that defendant's case is not substantially similar to any of these.

Defendant personally committed three murders and participated in a fourth. "This Court has never found a sentence of death disproportionate in a case where a defendant was convicted of murdering more than one victim." *State v. Meyer*, 353 N.C. 92, 120, 540 S.E.2d 1, 17 (2000) (citation omitted), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 54 (2001). We also consider the brutality of the murders. *State v. Duke*, 360 N.C. 110, 144, 623 S.E.2d 11, 33 (2005) (citations omitted), *cert. denied*, 549 U.S. 855, 166 L. Ed. 2d 96 (2006). These killings involved the close-range shooting of young, unarmed victims who had done defendant no wrong. Victim Ryals was killed in his own home, a place where a person has a right to feel secure. *State v. Holmes*, 355 N.C. 719, 745, 565 S.E.2d 154, 172 (citation omitted), *cert. denied*, 537 U.S. 1010, 154 L. Ed 2d 412 (2002).

Defendant was convicted of first-degree murder under the felony murder rule and on the basis of malice, premeditation, and deliberation. "Although a death sentence may properly be imposed for convictions based solely on felony murder, a finding of premeditation and deliberation indicates a more calculated and cold-blooded crime for which the death penalty is more often appropriate." *Taylor*, 362 N.C. at 563, 669 S.E.2d at 276 (citations and internal quotation marks omitted). This Court has previously found the section 15A-2000(e)(6) aggravating circumstance (stating that the murder "was committed for pecuniary gain"), standing alone, sufficient to uphold a death sentence. *See State v. Chandler*, 342 N.C. 742, 760, 764, 467 S.E.2d 636, 646, 649, *cert. denied*, 519 U.S. 875, 136 L. Ed. 2d 133 (1996); *Ward*, 338 N.C. at 124, 129,. 449 S.E.2d at 743, 746. Similarly, this Court has previously found that the section 15A-2000(e)(11) aggravating circumstance (The murder was committed as "part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.") is by itself sufficient to support a death sentence. *Polke*, 361 N.C. at 77, 638 S.E.2d at 196 (citing *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513

**STATE v. PHILLIPS**

[365 N.C. 103 (2011)]

U.S. 1159, 130 L. Ed. 2d 1083 (1995)). These murders were part of a course of conduct involving arson, assault, and kidnapping, among other criminal acts.

This Court also compares the present case with cases in which we have found the death penalty to be proportionate. *State v. al-Bayyinah*, 359 N.C. 741, 762, 616 S.E.2d 500, 515 (2005), *cert. denied*, 547 U.S. 1076, 164 L. Ed. 2d 528 (2006). After carefully reviewing the record, we conclude that this case is more analogous to cases in which we have found the sentence of death to be proportionate than to those cases where we have found it disproportionate or to those cases in which juries have consistently recommended sentences of life imprisonment. Although defense counsel presented evidence of several mitigating circumstances, including defendant's mental or emotional disturbance at the time of the crime and his borderline level of intellectual functioning, and although at least one or more jurors found several of these mitigating circumstances to exist, we are nonetheless convinced that the sentence of death here is not disproportionate.

Accordingly, we conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error, and the death sentence recommended by the jury and imposed by the trial court is not disproportionate. Accordingly, the judgments of the trial court are left undisturbed.

NO ERROR.

Justice JACKSON did not participate in the consideration or decision of this case.